[Civ. No. 32576. Second Dist., Div. Two. Mar. 5, 1969.]

IMPERIAL METAL FINISHING CO., Plaintiff and Respondent, v. LUMINOUS CEILINGS WEST, INC., Defendant and Respondent; L. J. SEGIL CO., Third Party Claimant and Appellant.

Swerdlow, Glikbarg & Shimer, Irving A. Shimer and Paul N. Crane for Third Party Claimant and Appellant.

Hurley R. Talpis and Everett Rauh for Plaintiff and Respondent.

No appearance for Defendant and Respondent.

HERNDON, Acting P. J. — Third party claimant L. J. Segil Co. appeals from an "Order Determining Status, Title and Right to Possession of Money Deposited with the Sheriff" adverse to it and in favor of respondent Imperial Metal Finishing Co.

The primary question presented for our consideration is this: Under the circumstances presented in the instant case, should the money in dispute be regarded as cash placed under attachment "in lieu of merchandise" previously attached, or must such cash, as a matter of law, be treated as a "cash bond" regardless of the contrary intention of the parties?

We have concluded that, under the unusual facts here presented, the cash deposited with the sheriff in the amount of $7,000 was substituted for, or added to, the personal property then under attachment and that following the deposit the respective rights of the contending parties with respect to the deposited cash were identical to their respective rights with respect to the attached personal property thus replaced or augmented by the cash deposit.

The facts are not in dispute. On October 19, 1965, Luminous Ceilings West, Inc. [Luminous] executed a security agreement covering its inventory of heavy equipment, etc., in favor of appellant to secure its indebtedness of an amount in excess of $300,000. On April 1, 1966, Luminous executed a promissory note to respondent in the amount of $7,700. After paying $2,400 thereon Luminous defaulted on November 1, 1966.

On January 4, 1967, Luminous entered into an agreement with Milton J. Wershow Co., auctioneers, which provided for Wershow to sell, at public auction, the property encumbered by appellant's security agreement. Contemporaneously therewith appellant and Luminous entered into a written agreement whereby appellant agreed that ''the subject sale may go forward and agrees to execute such release instruments as may be necessary to enable [Wershow] to deliver title to the subject property to your purchasers, free and clear of the security agreement, provided, however, such release shall not be or become effective unless and until L. J. Segil Company has received the entirety of the proceeds [of the sale] and *provided further, such proceeds shall at all times be subject to the lien of the security agreement referred to above.*'' (Italics added.)

Because of the nature of the heavy and specialized equipment involved in the sale, considerable publicity and promotion were required to insure reasonable bidding by potentially interested purchasers. Respondent's attorney candidly conceded that he and his client knew of the auction scheduled for January 18, 1967. In fact, as respondent's counsel advised the court, ''They had spent many thousands of dollars in producing a brochure indicating the date and the time of the sale. Now, a lot of money is spent in promoting an auction, Your Honor, of heavy equipment. And if they didn't go ahead on the 18th and if they didn't post the $7,000 [the subject matter of the instant proceeding] permitting them to take bids,

they would have lost more money. They would have lost a heck of a lot of money.''

On January 11, 1967, with knowledge of the scheduled auction, respondent filed an action against Luminous on its promissory note praying for recovery of $5,300 plus interest, etc., and obtained the issuance of a writ of attachment thereon based upon the declaration of its president, Leon N. Keizer, under penalty of perjury stating in part as required by Code of Civil Procedure, section 538, subdivision 3: ''That the attachment is not sought, and the action is not prosecuted, to hinder, delay, or defraud any creditor or creditors of the defendant.'' Respondent then instructed the sheriff's department to ''levy upon the personal property described as follows: [Luminous'] place of business including furniture, fixtures, and equipment and all other personal property per inventory filed in the Sheriff's Office belonging to [Luminous] located at 3053 Treadwell Street, in the City of Los Angeles, County of Los Angeles, State of California.'' The attached property, as respondent unquestionably well knew, was of a value many, many times the amount sought in its complaint.

When appellant learned that respondent's levy had been made and that a keeper had been placed upon the premises, on January 13, 1967, it filed with the sheriff a third party claim which recited its security interest in the property in accordance with Code of Civil Procedure section 689b. The sheriff's notice of this claim was received by respondent's attorney on January 16, 1967. Accordingly, with the intervening weekend, the five-day period provided by section 689b within which respondent might challenge appellant's claim would not expire until January 23, 1967. Therefore, respondent's attachment lien would remain in effect until after the date for which the auction had been arranged and scheduled.

As anticipated, this circumstance placed Luminous, the sheriff's office, appellant, Wershow and the prospective bidders in a rather dilemmatic position on the morning of the scheduled auction, January 18, 1967. Of course, if the sheriff's representatives had allowed the auction to proceed, the proceeds resulting therefrom, or so much thereof as were required to meet appellant's attachment lien, might have been retained by the sheriff subject to a later determination of the appellant and respondent's respective rights thereto. Since the instant proceeding did not reach a stage wherein respond-

ent was required to challenge the validity or priority of appellant's security interest in the property, its counsel necessarily conceded in the trial court: "Let's assume that they had a sale and then from the proceeds they took the $7,000 and they put it in the Sheriff's Office. I think I would be out of luck."

However, the sheriff's representatives, apparently fearful of their position in the premises, ordered Wershow not to proceed with the auction. Of course, such "order" was legally improper insofar as it purported to prevent either the attachment debtor, Luminous, or appellant from selling whatever right, title or interest they might have in the property subject to respondent's attachment. (*United States Overseas Airlines* v. *County of Alameda*, 235 Cal.App.2d 348, 353 [45 Cal.Rptr. 337].) However, the concern of the sheriff's representatives was readily understandable.

In cases involving a sale of attached property by a warehouseman with whom the sheriff has stored the property, it has been held that the sheriff " 'had no right to sell the property, or to permit it to be sold, pending the suit, in the absence of an order of the court directing its sale. The act of the warehouseman in making the sale is to be treated as the act of his principal, the sheriff; and in so selling or permitting the property to be sold without authority of law, the sheriff became liable as for a conversion of the property . . .' " (*Reynolds* v. *Lerman*, 138 Cal.App.2d 586, 592 [292 P.2d 559], quoting from *Aigeltinger* v. *Whelan*, 133 Cal. 110, 112 [65 P. 125].)

Therefore, although the sheriff's representatives should not have attempted to prevent the auctioneer, who was not acting as the sheriff's agent, from selling appellant's and the attachment debtor's interest in the property, they acted properly in informing the prospective buyers that the property was in their possession under an attachment and that the sellers could neither transfer title free of the attachment nor cause the property to be removed from the sheriff's possession.

However, the sheriff's representatives, recognizing the impractical and intolerable dilemma in which all parties had been placed by respondent's actions, suggested that the property be freed from the attachment by giving a bond in accordance with Code of Civil Procedure section 540. In accordance with its customary practice, Wershow, the auctioneer, offered to advance to appellant, against the anticipated proceeds of

sale, the $7,000 demanded by the sheriff's representatives for this purpose.

Appellant's counsel, of course, realized that if cash, from whatever source, were to be posted in such fashion *as a bond* to lift respondent's attachment, appellant automatically would lose $7,000 since Luminous' liability to respondent was not contestable. Therefore, appellant refused to sign either the ''Cash Bond Authorization'' or the ''Pay-over Authorization''[1]

[1]''COUNTY OF LOS ANGELES
SHERIFF'S DEPARTMENT
STATE OF CALIFORNIA
CASH BOND AUTHORIZATION

| SUPERIOR | | 901 286 |
|---|---|---|
| Court | | Case No. |
| IMPERIAL FINISHING CO. | Vs. | LUMINOUS CEILINGS WEST, INC. |
| PLAINTIFF | | DEFENDANT |
| | | A CORPORATION |

''I hereby hand to the Sheriff of Los Angeles County the sum of $7,000.00, Cash Bond, in lieu of undertaking, under Section 540 C.C.P., for the release of property from attachment in the above entitled action.

1-18-67
Date

L. J. Segal Refused to sign                                                                 Signature
        S. Sloan''

''COUNTY OF LOS ANGELES
OFFICE OF THE SHERIFF
PETER J. PITCHESS, SHERIFF
LOS ANGELES, CALIFORNIA 90012

S901286
Case Number

Imperial Metal Finishing Co.
Plaintiff

Luminous Ceilings West Inc.
Defendant

PAY-OVER AUTHORIZATION

''I herewith hand to the Sheriff of Los Angeles County, the sum of $_____ in full/partial settlement in the above entitled action, and authorize said sheriff to pay said sum, less sheriff's fees, to the plaintiff or his attorney, for the reason that I owe said claim, and do not intend to defend against it.

Date                                                By (signature)

Deputy/Keeper                                        Title
L. J. Segal Refused to sign
        S Sloan''

. . .

forms as prepared and presented to it by the sheriff's representatives, and its refusal was noted thereon.

Following further discussion between the sheriff's representatives and appellant's counsel, it was ultimately agreed that the $7,000 itself would be placed under attachment. Thereafter, although the sheriff's representatives still did not release the personal property from the existing attachment, they ceased interfering with the progress of the auction. The auction proceeded and bids were taken although the keeper remained in possession of the property until January 23, 1967.

It is beyond question that each of the parties to the proceedings regarded the $7,000 received by the sheriff as additional or substituted property placed under attachment. No one considered it to be a cash bond and it never served the function of a cash bond since the respondent's attachment was not lifted thereby.

On both the receipt given for the money and on his "Register of Action," the deposit was classified by the sheriff as "Money *attached*, $7,000." (Italics added.) In addition, the sheriff's representative who had handled the transaction expressly testified: "Q. Did you consider the $7,000 to have been deposited as a cash bond for release of attachment? A. No, sir. I did not. Q. And, as a matter of fact, you kept the keeper in for the full five days permitted under Section 689b, is not that correct? A. Yes, we did. Q. So you didn't consider the $7,000 to be a release of attachment bond? A. If it had been, sir, the keeper would have been released. Q. Immediately? A. Immediately."

Similarly, it is clear, as evidenced by its failure to sign the Cash Bond Authorization or Pay-over Authorization that appellant would not have deposited the money advanced from the proceeds by the auctioneer if it had considered that it might possibly be construed to be something other than additional or replacement property subject to its security interest. That is, appellant considered the funds to be exactly what they were, i.e., an advance against the proceeds to be derived from the sale. This view is in accord with the provisions of Commercial Code section 9306, subdivisions (1) and (2), and also with the terms of appellant's security agreement which provides in part:

"Secured Party's security interest hereunder shall attach to all proceeds (whether represented by cash, checks, drafts,

notes, chattel paper, open account or otherwise) of all sales or other dispositions of Debtor's inventory.''

Respondent also demonstrated by its subsequent actions that it regarded the $7,000 as attached property subject to appellant's security interest. On January 23, 1967, it obtained and subsequently filed a surety bond as ''an undertaking for Third Party Claim as provided by Section 689 C.C.P.'' in the sum of $14,000. It is self-evident that if respondent had regarded the $7,000 as a cash bond given under section 540, it would not have filed such an undertaking in double the amount thereof to protect its interest therein.

In this regard it may be noted that contrary to the views expressed by the trial court in its memorandum opinion, respondent's bond was not necessarily ineffective because it was not in an amount double appellant's third party claim, i.e., an amount in excess of half a million dollars. This view appears to have had considerable effect upon the trial court's ultimate holding herein for as stated in its memorandum opinion:

''The requirements of the statute make it financially impracticable for any small creditor to protect his attachment against a third party claimant who asserts a comparatively large mortgage, even if the odds were extreme that the mortgage could be proven invalid. I mention this only as a general comment on the harshness of this statute, in certain situations. I have no reason, in the instant case to doubt the validity of the mortgage, even if I had jurisdiction to inquire into the matter.''

We find no such harshness in the statute. Under it an attaching creditor is entitled to a hearing in which he may challenge the validity of the third party claim ''whether any undertaking . . . be given or not.'' (Code Civ. Proc., § 689b, subd. (10).) In addition, if he wishes both to challenge the validity of the asserted security interest and to have the officer retain the attached property pending a hearing, he may deliver an ''undertaking in double the amount of the indebtedness claimed by the seller or mortgagee *or double the value of the personal property* as the officer may determine and require . . .'' (Italics added.) (Code Civ. Proc., § 689b, subd. (9).) Therefore, all an attaching creditor need do to guard against ''hardship'' is to avoid instructing the sheriff to make an excessive attachment. Even in the instant case, once the clearly identifiable $7,000 had been placed under

attachment, it was not inappropriate for respondent to file a bond in double that amount and allow all the other property previously subjected to attachment to be released. The validity of the security interest could then have been tested without risk to either appellant or respondent.

However, in the instant case respondent did not seek a hearing on the validity of appellant's asserted security interest and when appellant did so by petition filed January 30, 1967, respondent initially challenged its claim on the sole ground that the petition was untimely and therefore the court lacked jurisdiction to determine title to the $7,000 in a section 689b proceeding. When this "defense" was shown to be without factual foundation, respondent suggested for the first time the possibility that despite the intention of all parties, the $7,000 must be regarded as a cash bond.

As we have stressed, the evidence is without conflict that the deposited money was intended to be merely in substitution for a portion of the personal property theretofore attached by appellant and was so accepted by the sheriff's representatives. In addition to the testimony on the subject given by appellant's president and the sheriff's representative, the following written document prepared by the sheriff's representative was accepted by him after being modified as indicated by appellant's president:

"I, L. J. Segil, do hereby agree to release sufficient amount of property claimed by me as my property and to be released to the defendants [Luminous] and sold for at least $7,000.00 and said amount of $7,000.00 is to be posted with the Sheriff in lieu of merchandise."
of Los Angeles County as the defendants ~~cash bond.~~

In its memorandum opinion the court recognized that appellant and the sheriff had regarded the deposit of the $7,000 as merely in substitution of, or as effecting an addition to, the attached personal property, which act respondent had confirmed by posting its own bond to protect its attachment therein in the amount of $14,000. Nevertheless, apparently moved in large part by its mistaken view that compliance with section 689b would have required respondent to have posted a bond for more than half a million dollars, the trial court concluded it "must treat this fund as legally constituting a cash bond posted under section 540 C.C.P." The considerations upon which this decision was based were set forth as follows:

"I reach this result primarily because I can find in the books no other legal reason for the sheriff *changing his position with respect to permitting the auction sale to proceed.* Furthermore, I think it makes a great deal of practical common sense to treat this money as a cash bond posted to release an attachment. Competing creditors should not be encouraged to play technical games, with the sheriff's office in the middle, when unusual situations arise. It is better, I think, to discourage the use of exceptional, equivocal, and unprecedented legal forms when field decisions have to be made, in a hurry, by custodial officers.

"Even though the attachment lien apparently had no real economic value, (as the mortgage balance apparently exceeded the value of the property of the debtor by a wide margin) it was technically valid and had strategic value or bargaining value, in a situation wherein the third party claimant had every other advantage. The law gives one attaching creditor whose claim is small compared to that of the mortgagee, no economically feasible remedy except to press *the nuisance value* of his attachment." (Italics added.)

As we have previously pointed out, the sheriff's representatives *had no legal reason sufficient to justify their refusal to permit the auction to proceed.* Since the auction was to be held on the premises, it certainly would have been proper for the sheriff's representatives to advise the bidders that the property was being held under attachment and would not be released to a purchaser. However, they should not have sought to prevent Luminous or appellant from selling whatever right, title and interest they had therein.

We are wholly in accord with the trial court's holding that "competing creditors should not be encouraged to play technical games with the sheriff's office in the middle." Neither should a creditor be permitted to convert his protective right of attachment into a sword with which to coerce others into affording him rights or advantages to which he is not otherwise legally entitled.

It is for this very reason that respondent's president was required to declare under penalty of perjury before obtaining the issuance of the writ of attachment that "the attachment is not sought, . . . to hinder, delay, or defraud any creditor of the defendant." (Code Civ. Proc., § 538, subd. 3.) This requirement is specifically and expressly designed to prevent the attaching creditor from determining "to press *the nui-*

*sance value* of his attachment" and to "play technical games with the sheriff's office in the middle." To reward respondent for the very conduct proscribed by the letter and the spirit of the law was erroneous. "Nuisances," generally, are to be abated, not encouraged.

Of course, as the trial court correctly observed, decisions such as *Koehler* v. *Serr*, 216 Cal. 143 [13 P.2d 673, 89 A.L.R. 262]; *Fresno Home Packing Co.* v. *Hannon*, 16 Cal.App. 284 [116 P. 687], and others cited by respondent, are not relevant to the instant case. These decisions merely stand for the proposition that where *a surety bond, or cash bond, is given* to prevent a levy being made or to release property from purported attachment, it is immaterial whether or not any property actually was subject to attachment.

In the instant case, it is clear that no cash bond was given and no property was released from attachment. Respondent's attachment lien actually continued in effect for the full statutory period on all the personal property attached despite the fact that by subjecting to attachment the $7,000 advanced against the proceeds of the sale of the personal property, respondent's interest therein, if any, was adequately protected.

However, although we hold that the court's decision determining that the $7,000 held under attachment was a cash bond was erroneous, we do not agree with appellant's contention that we may order judgment entered for it on the record before us. ▮▮ It appears that when respondent posted its $14,000 bond to protect its attachment of the $7,000, it was advised by the sheriff's office that it was unnecessary to file a verified statement that appellant's security interest was void or invalid as required by Code of Civil Procedure section 689b. That is to say, the sheriff's office and respondent appear to have believed that following the deposit of $7,000, and the ultimate release of the personal property itself at the end of the fifth day, the respective rights of the parties to the $7,000 were to be determined in accordance with section 689 rather than section 689b.

Throughout the confused hearing conducted herein, each party adopted an extreme position which, if accepted by the trial court, avoided the necessity of determining the validity of appellant's security interest. In fact, at one time or another each party contended that the trial court had no jurisdiction to determine title to the $7,000. Appellant's conten-

tion was based on the fact that respondent had not filed a verified statement challenging the validity of its security interest and respondent's on the basis that the $7,000 was a cash bond to which appellant's security interest, valid or invalid, would have no application.

In view of the peculiar circumstances here presented, we believe that appellant's petition for hearing filed herein constituted a waiver of any failure on respondent's part to comply with section 689b by filing a verified statement in addition to posting a bond in double the amount of the property then subject to attachment. By reason of the trial court's determination that the $7,000 was a cash bond, it was unnecessary to inquire into the validity of appellant's security interest or the possibility that appellant corporation and Luminous were mere *alter egos* of Mr. Segil, who apparently was their common president and owner of a controlling amount of their stock. Respondent, if it chooses so to do, should have the opportunity to raise these issues upon retrial.

The order under review is reversed for further proceedings not inconsistent with this opinion.

Fleming, J., and Wright, J., concurred.